IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**DAYLON CARL WALDROP**                                          **PLAINTIFF**

v.                                                                                            No. 3:24CV311-DAS

**SUPT. CHRIS LODEN, ET AL.**                                   **DEFENDANTS**

**MEMORANDUM OPINION**

This matter comes before the court on the *pro se* prisoner complaint of Daylon Carl Waldrop, who challenges the conditions of his confinement under 42 U.S.C. § 1983. That statute provides a federal cause of action against "[e]very person" who under color of state authority causes the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. For the purposes of the Prison Litigation Reform Act, the court notes that the plaintiff was incarcerated when he filed this suit.[1]

The MDOC defendants moved [20] for partial summary judgment, seeking dismissal of five claims for failure to exhaust administrative remedies. The court granted [27] the motion, dismissing the following claims for failure to exhaust: (1) placement in lockdown 24 hours per day; (2) improper shower call; (3) improper yard call; (4) exposure to inmate suicides and the sound of gunshots; and (5) moldy showers. The court then issued an order [30] for the plaintiff to show cause why the remaining claims should not be dismissed. The plaintiff has not responded to the motion, and the deadline to do so has expired. For the reasons set forth below, some of the plaintiff's remaining claims will be

---

[1] *See* 42 U.S.C. § 1997e(a); *see also Williams v. Henagan,* 595 F.3d 610 (5th Cir. 2010) (PLRA applies when inmate is incarcerated at the time he files suit, even if he was released during pendency of suit).

dismissed for failure to exhaust administrative remedies, and the rest will be dismissed for failure to state a claim upon which relief could be granted.

**Factual Allegations**

**MCCF Events**

The plaintiff, Daylon Carl Waldrop, alleges that, while he was housed at MCCF in Holly Springs, Mississippi, the defendants violated his right to due process in finding him guilty of several prison rule violations. Doc. 1. Waldrop alleges that on March 12, 2024, guards restrained him, searched his person and property, and placed him in administrative segregation. *Id*. at p. 8. He claims that he was served a detention notice, but he was not told why he was placed in administrative segregation. *Id*. He states that he later received three Rule Violation Reports ("RVRs")—one for criminal gang activity (No. 2077889) and two for the possession of major contraband (Nos. 2077595 (knife) and 2077597 (cell phone)). *Id*. He argues that the RVRs did not list "specific acts" or "circumstances and details." *Id*.

Waldrop later attended a detention hearing, during which officers gave statements regarding the bases of the RVRs – and presented the evidence obtained during their investigation. *Id*. at 9. Waldrop, however, challenges the investigative process, *id*., arguing that the evidence adduced was insufficient to find him guilty of the three RVRs. *Id* at 9-14. As a result of guilty findings, Waldrop lost privileges, was recommended for reclassification, and was transferred from MCCF to Walnut Grove Correctional Facility (WGCF). *Id*. at 13.

**WGCF Events**

Waldrop also alleges that, during his stay at WGCF, the defendants violated the Eighth Amendment prohibition against cruel and unusual punishment by subjecting him to harsh general conditions of confinement: (1) lockdown 24 hours per day, (2) improper shower call, (3) improper

yard call, (4) exposure to inmate suicide and the sound of gunshots, and (5) moldy showers.[2] Doc. 1, p. 13. He further alleges that, while at WGCF, he was harassed and strip-searched; the defendants conducted improper shakedowns of his cell; and the defendants took his property without due process of law. *Id*.

### Waldrop Is Not Entitled Due Process Protections as to the Allegedly Defective RVR Appeals at Marshall County Correctional Facility

The plaintiff argues that, during his stay at the Marshall County Correctional Facility, the defendants violated his right to due process in finding him guilty of three rule violations: No. 2077889 (criminal gang activity) and Nos. 2077595 and 2077597 (possession of major contraband). *Id*. His punishment regarding No. 2077889 (gang activity) was 60 days loss of canteen privileges and recommendation for reclassification. His punishment for each of the other violations (Nos. 2077595 and 2077597 (contraband)) was 180 days loss of canteen and visitation – for a total of 360 days loss of these privileges. As discussed below, these punishments are not severe enough to trigger due process protections.

Under the ruling in *Sandin v. Conner*, 515 U.S. 472 (1995), as to the appeal of these three infractions, the plaintiff has not set forth a valid claim for violation of the Due Process Clause or any other constitutional protection. Though

> [s]tates may under certain circumstances create liberty interests which are protected by the Due Process Clause, . . . these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

---

[2] The court previously granted the defendants' motion for partial summary judgment and dismissed these five claims. The court has included them in the instant memorandum opinion for completeness' sake.

*Id.* 115 S. Ct. at 2300 (citations omitted). In *Sandin*, the discipline administered to the prisoner was confinement in isolation. The Court found that this discipline fell "within the expected parameters of the sentence imposed by a court of law," and "did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." *Id.* at 2301 and 2300.

Under these facts, the punishment the plaintiff received does not rise to the level of a liberty interest protected under the Due Process Clause itself or State law or regulations, such as :

Advanced written notice of the claimed violation;

A written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken;

The ability to call witnesses (which can be limited at the discretion of prison officials for security and other reasons);

The ability to present documentary evidence.

*Wolff v. McDonnell*, 418 U.S. 539, 563-567 (1974); *see also Malchi v. Thaler*, 211 F.3d 953, 958 (5th Cir. 2000) (holding prisoner's thirty-day loss of commissary privileges and cell restriction due to disciplinary action failed to give rise to due process claim).

In the present case, the plaintiff's punishments were: loss of canteen and visitation, as well as recommendation for reclassification. Such punishments clearly fall "within the expected parameters of the sentence imposed by a court of law," *id.* at 2301, and "did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." *Id.* As such, the plaintiff's allegations regarding violation of his right to due process arising out of the rule violation guilty findings are without merit, and they will be dismissed with prejudice for failure to state a claim upon which relief could be granted.

**Waldrop's Allegations Regarding Harassment, Strip-Searches,
Improper Shakedowns, the Right to Freedom of Association,[3] the Right to
Equal Protection, and the Taking of His Property at the Walnut Grove
Correctional Facility Fail on the Merits**

Waldrop further alleges that, during his stay at the Walnut Grove Correctional Facility, the defendants harassed him, subjected him to strip-searches, conducted improper shakedowns of his cell, and took his property without due process of law. For the reasons discussed immediately below, it appears that none of these allegations state a valid claim for relief under 42 U.S.C. § 1983.

**Conclusory Allegations Which Do Not State a Valid Constitutional Claim: Taking
of His Property, Harassment, Strip-Searches, and Improper Shakedowns**

Waldrop's allegations regarding the taking of his property, harassment, strip-searches, and improper shakedowns are conclusory; he has provided no factual allegations to support these claims. *See Arnaud v. Odom,* 870 F.2d 304, 307 (5th Cir. 1989) ("A plaintiff may not, however, plead merely conclusory allegations to successfully state a section 1983 claim, but must instead set forth specific facts which, if proven, would warrant the relief sought"); *see also Buckenberger v. Reed*, 342 F. App'x 58, 64 (5th Cir. 2009). Waldrop has not identified the property allegedly taken from him, nor has he specified actions the defendants have taken that may constitute harassment. He has not alleged facts to show that the alleged strip-searches and shakedowns were improper. Hence, Waldrop's allegations lack specific operative facts and will be dismissed for that reason. *See Young v. Biggers*, 938 F.2d 565, 569 (5th Cir. 1991).

**Allegations Regarding the Taking of Property Without
Due Process of Law Fail to State a Valid § 1983 Claim**

Waldrop alleges that his "property [was taken] with no receipt," which the court construes as a

---

[3] He couched this allegation in terms of his "right to peaceable assembly," but it most closely implicates the First Amendment right to freedom of association.

claim that the defendants took his property without due process of law.[4] The random and unauthorized deprivation of a prisoner's property by a state actor does not violate the prisoner's due process rights if the state provides an adequate post-deprivation remedy. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Parratt v. Taylor*, 451 U.S. 527, 541-44 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327, 330-31 (1986). This rule, the *Parratt/Hudson* doctrine, provides that

> no constitutional claim may be asserted by a plaintiff who was deprived of his liberty or property by negligent or intentional conduct of public officials, unless the state procedures under which those officials acted are unconstitutional or state law fails to afford an adequate post-deprivation remedy for their conduct.

*Martin v. Dallas County, Tex.*, 822 F.2d 553, 555 (5th Cir. 1987); *see also Hudson*, 486 U.S. at 533, *Daniels*, 474 U.S. at 330-31; *White v. Epps*, 411 Fed.Appx. 731 (5th Cir. 2011). Thus, the initial question regarding the taking-of-property claim is whether Mississippi law affords him an adequate post-deprivation remedy for his loss.

In most circumstances, suits against the Mississippi government would be controlled by the Mississippi Tort Claims Act, Miss. Code Ann. § 11-46-9 ("MTCA"), which became effective on April 1, 1993. As to suits filed by prisoners, the MTCA states:

> (1) A governmental entity and its employees acting and within the course scope of their employment or duties shall not be liable for any claim:
>
> . . .
>
> (m) Of any claimant who at the time the claim arises is an inmate of any detention center, jail, workhouse, penal farm, penitentiary or other such institution, regardless of whether such claimant is or is not an inmate of any detention center, jail, workhouse, penal farm, penitentiary or other such institution when the claim is filed.

Miss. Code Ann. § 11-46-9(1)(m).

---

[4] It is not clear from the plaintiff's allegations whether the defendants have returned his property to him. However, the court has construed the allegation in the light most favorable to the plaintiff, as required at this stage of proceedings. *See* Fed. R. Civ. P. 12(c), 12(b)(6).

At first blush, this statute would seem to foreclose any remedies the plaintiff may have under state law. However, the plaintiff's remedy for the taking of property arises directly from the Constitution of the State of Mississippi, which cannot be circumvented through a state statute. *Pickering v. Langston Law Firm, P.A.*, 88 So.3d 1269 (Miss. 2012). The unlawful taking of an inmate's property can violate Article 3, Section 17 of the Constitution of the State of Mississippi. *Bishop v. Reagans*, 2012 WL 1804623 (S.D. Miss.), *citing Johnson v. King*, 85 So.3d 307 (Miss. App. 2012).

> Article 3, Section 17 of the Mississippi Constitution reads:
>
> Private property shall not be taken or damaged for public use, except on due compensation being first made to the owner or owners thereof, in a manner to be prescribed by law; and whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use by the public shall be a judicial question, and, as such, determined without regard to legislative assertion that the use is public.

Miss. Const., Art. 3, Section 17.

The circumstances in *Johnson* are legally indistinguishable from those in the instant case. The prison officials in that case confiscated Johnson's drinking mug and disposed of it. *Johnson v. King*, 85 So.3d 307, 311-312 (Miss. App. 2012). Johnson had purchased the mug from the canteen with his own money. *Id*. The mug, as purchased, was not considered contraband, and Johnson had not modified the mug in such a way to turn it into contraband. *Id*.

The Mississippi Court of Appeals held that, under these circumstances, the taking of Johnson's mug violated the Mississippi Constitution and that prison officials had to either replace the mug or compensate Johnson for the fair value of the mug. *Id*. The facts in *Johnson* mirror those in the present case. As such, the plaintiff in this case has an adequate remedy under state law, and his claims for the taking of his property without due process of law will be dismissed.

**Equal Protection: Other Inmates Involved in the Three
Rule Violations Were Not Treated as Harshly[5]**

The plaintiff alleges that other inmates involved in the three rule violations were not treated as harshly as he was:

(1) They were not transferred to Walnut Grove Correctional Facility;

(2) They were not reduced in custody;

(3) They were not threatened with transfer to an out-of-state prison;

(4) They were not placed in the Security Threat Group [Gang] Program.

Doc. 1, p. 11. This allegation must be dismissed for failure to state a valid claim under 42 U.S.C. § 1983.

Put simply, the equal protection clause directs states to treat all similarly situated persons alike. *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). A state government violates the Equal Protection Clause only by intentional discrimination. *Lavernia v. Lynaugh,* 845 F.2d 493, 496 (5th Cir.1988). "Discriminatory purpose . . . implies more than intent as violation or as awareness of consequences[.] . . . It implies that the decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for *the purpose* of causing its adverse effect on an identifiable group[.]" *Id.* (internal quotations, citations, and footnote omitted) (emphasis in opinion).

A violation of the equal protection clause can occur only when the governmental action in

---

[5] Though not entirely clear, it appears that Waldrop's claims of equal protection, the right to freely associate with others, and the taking of his property without a receipt were merely part of the narrative describing his challenge to the guilty findings on the three RVRs at issue in this case, rather than substantive claims in their own right. The court will nonetheless discuss them as separate allegations. *See Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 596, 30 L. Ed. 2d 652 (1972) (courts must construe *pro se* pleadings liberally).

question classifies or distinguishes between two or more relevant persons or groups. *Brennan v. Stewart,* 834 F.2d 1248, 1257 (5th Cir.1988). The plaintiff's equal protection claim in this case must therefore fail, as he has not identified two or more relevant persons or groups which the government has classified and treated differently – and to his detriment. *Vera v. Tue*, 73 F.3d 604, 609-10 (5th Cir. 1996). In addition, to state a claim under the Equal Protection Clause, a plaintiff suing under § 1983 must allege that a state actor intentionally discriminated against him because of his membership in a protected class. *Williams v. Bramer*, 180 F.3d 699 (5th Cir. 1999).

In the present case, the plaintiff has neither identified a protected class to which he belongs, nor a different class to which the others belong. As such, the conduct at issue does not constitute discrimination in violation of the Equal Protection Clause. For this reason, as well, it appears that the plaintiff's equal protection allegations should be dismissed with prejudice for failure to state a claim upon which relief could be granted.

**The Right to Freedom of Association: Restriction from Participating in Leisure Activities**

Waldrop also alleges that he was punished through the Rule Violation Report process for participating in "non-criminal leisure activities," such as educational classes, church activities, and gym call. Doc. 1, p. 11. He alleges that these were the activities used as evidence to show that he was associating with known gang members. *Id.*, at 10-11. He thus argues that the defendants violated his right to freedom of association with other inmates. His argument fails for multiple reasons, including the fact that evidence other than his participation in leisure activities supported the guilty finding.

First, "[m]any of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner. An inmate does not retain rights inconsistent with proper incarceration." *Overton v. Bazzetta*, 539 U.S. 126, 131, 123 S. Ct. 2162, 2167, 156 L. Ed. 2d 162 (2003). Indeed, "freedom of association is among the rights *least* compatible with incarceration." *Id*. (emphasis added). In

addition, courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Id.*

The Supreme Court addressed this commonsense notion nearly fifty years ago:

> The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration.

*Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). Incarceration, by its very nature, drastically limits the First Amendment right to free association, and the court must give broad deference to prison officials' decisions regarding those limits.

According to the Rule Violation Reports at issue here, Waldrop committed three serious prison rule violations in a short time: engaging in criminal gang activity and two instances of possession of major contraband.[6] The documentation shows that, pursuant to an investigation of prison gang activity, prison officials recovered a great deal of contraband during the shakedown of Waldrop's unit – and obtained video and photographic evidence of even more contraband from two of the cell phones recovered. Doc. 20-2 at 12-17. Evidence gathered during the shakedown of suspected gang members showed that Waldrop possessed various items of contraband: (1) blue and white pills in an unmarked container; (2) two cell phones; and (3) a free world pocket knife. *Id.* Investigator Thomas Mauney summarized the evidence:

> *During the course of an investigation into STG [gang] activity at Marshall County Correctional Facility two (2) cell phones … were located in Charlie 3 common area. The phones were submitted to CID [Corrections Investigation Division] and information was obtained from the phones. The downloaded information showed*

---

[6] To the extent that he challenges the validity of the three guilty findings, that challenge appears to be without substantive merit, as discussed elsewhere in this memorandum opinion.

> Inmate Daylon Waldrop #199886 using the phones to make videos. It clearly shows that he is the person operating the phone. It also shows him in possession of a free world knife (black handle lock back type with a belt clip) in the shower and on the yard.

Doc. 20-2, p. 22 (emphasis added). In support of their summary judgment motion, the defendants presented stills from the videos saved on the recovered cell phones showing that Waldrop possessed both the phone and the knife at issue in this case. *Id*. at 12-17.

Investigators confiscated more contraband from the other suspected gang members, including phone chargers, super glue, bags of suspected marijuana, bags of suspected "spice," Bluetooth earphones, a ledger with drug price list, other inmates' commissary receipts (often used as a form of currency in prison), a $100 bill, a phone SIM card puller, CashApp, bags of suspected methamphetamine, and a six-inch metal shank. *Id*. at 16. The contraband collected from the common areas during the shakedown included 12 cell phones, 6 charging cables and blocks, 2 metal shanks, one set of digital scales, one cell phone battery, tattoo equipment, 51 small bags of green leafy substance (suspected to be marijuana), and 7 small bags of white powdery substance (suspected to be methamphetamine). *Id*. To say the least, the STG investigators recovered a great deal of contraband during the shakedowns.

The STG Investigators conducted the targeted shakedowns because they were following leads on suspected gang members (including Waldrop), *id.* at 16, 22; they searched his cell based on those leads and the confiscated contraband. CID Investigators recovered video and photographic evidence from the confiscated cell phones – evidence of additional contraband, including the free world knife (not merely a handmade prison "shank.") As stated, though the cell phones were not discovered in Waldrop's personal belongings, video and photographic evidence pulled from the cell phones showed that he possessed and used both the cell phones and a free world folding knife.

Gang violence is a deadly and pernicious problem faced by prison administrators across the country:

> Jails and prisons also face grave threats posed by the increasing number of gang members …. See Brief for Policemen's Benevolent Association, Local 249, et al. as *Amici Curiae* 14 (hereinafter PBA Brief); New Jersey Comm'n of Investigation, Gangland Behind Bars: How and Why Organized Criminal Street Gangs Thrive in New Jersey's Prisons ... And What Can Be Done About It 10–11 (2009).
>
> "Gang rivalries spawn a climate of tension, violence, and coercion." Carlson & Garrett 462. The groups recruit new members by force, engage in assaults against staff, and give other inmates a reason to arm themselves. *Ibid.* Fights among feuding gangs can be deadly, and the officers who must maintain order are put in harm's way. PBA Brief 17.

*Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 331, 132 S. Ct. 1510, 1518–19, 182 L. Ed. 2d 566 (2012). In addition, contraband is the primary form of prison currency, and gangs exercise a great deal of control over it:

> Contraband creates additional problems because scarce items, including currency, have value in a jail's culture and underground economy. Correctional officials inform us "[t]he competition ... for such goods begets violence, extortion, and disorder." New Jersey Wardens Brief 2. Gangs exacerbate the problem. They "orchestrate thefts, commit assaults, and approach inmates in packs to take the contraband from the weak." *Id.,* at 9–10. This puts the entire facility … at risk.

*Id.* at 333. In this case, the initial investigative leads pointing to Waldrop and others in the unit as gang members, as well as the sheer amount of contraband confiscated (and its quality and value) suggest that gangs were involved in obtaining it.[7]

The propriety of limiting prisoners' First Amendment rights "arise[s] both from the fact of incarceration *and from valid penological objectives – including deterrence of crime,* rehabilitation of prisoners, *and institutional security.*" *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (quoting

---

[7] "Per the results of an investigation [into gang activity], targeted inmates were searched along with others and common areas in each pod." Doc. 20-2, p. 16, 22.

*Price v. Johnson*, 334 U.S. 266, 285 (1948)) (emphasis added). In this case, the court must give deference to prison officials' determination that Waldrop engaged in criminal gang activity – especially given the fact that possession of contraband within a correctional facility is, itself, a crime. Indeed, given the multiple videos and stills of him using a cell phone and brandishing a free world knife, there is no legitimate dispute that he possessed contraband in the facility. *See* Miss. Code Ann. § 47-5-193 (possession of contraband in prison is a felony); Doc. 20-2, p. 12-15.

The investigation of Waldrop arose out of concerns that he and others in his unit were gang members, and a targeted search of their living areas resulted in the confiscation of a large amount major contraband (including drugs, cell phones, and metal knives and shanks.) The possession of contraband such as drugs and knives in a detention facility in Mississippi is a serious crime – a felony carrying a sentence of three to fifteen years' incarceration and up to a $25,000 fine. *See* Miss. Code Ann. § 47-5-193 ("It is unlawful for any … offender … to possess any … contraband item"); Miss. Code Ann. § 47-5-195 (three- to fifteen-year sentence). Indeed, the Mississippi Supreme Court has upheld a twelve-year sentence for possession of a cellular phone in a prison. *See Nash v. State*, 293 So. 3d 265, 270 (Miss. 2020).

Hence, though prison officials chose to adjudicate and punish Waldrop's acts via prison rule violations, rather than criminal offenses, their finding that he was engaged in "criminal gang activity" appears reasonable. Certainly, the investigation and resolution fell within the "valid penological objectives [of] … deterrence of crime … and institutional security," *O'Lone, supra*., and the court will "accord substantial deference to the professional judgment of prison administrators," as required. *Overton v. Bazzetta*, 539 U.S. at 131. This claim for relief is without substantive merit.

### Failure to Exhaust Administrative Remedies: Harassment, Strip-Search, Improper Shakedowns, and Taking of Property

It appears that Waldrop has not exhausted his administrative remedies as to his allegations

regarding his substantive claims of harassment, strip-searches, improper shakedowns, and taking of property.[8] Though the plaintiff mentioned each of these allegations in various grievances, those grievances involved challenges to findings of guilt as to various prison rule violations (not the substantive claims raised in the instant complaint).

The appeal of a rule violation is a one-step process through the Administrative Remedy Program ("ARP"), while the allegation of a substantive constitutional claim through the ARP is a two-step process. Although exhaustion of administrative remedies is an affirmative defense, normally to be pled by a defendant, the court may dismiss a *pro se* prisoner case if failure to exhaust is apparent on the face of the complaint. *Carbe v. Lappin*, 492 F.3d 325 (5th Cir. 2007).

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e(a), requires prisoners to exhaust any available administrative remedies before filing suit under 42 U.S.C. §1983. The exhaustion requirement protects administrative agency authority, promotes efficiency, and produces "a useful record for subsequent judicial consideration." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Congress meant for the exhaustion requirement to be a tool to help weed out the frivolous claims from the colorable ones. *Jones v. Bock*, 549 U.S. 199, 203 (2007).

A prisoner cannot satisfy the exhaustion requirement "by filing an untimely or otherwise procedurally defective administrative grievance or appeal" because "*proper* exhaustion of administrative remedies is necessary." *Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006) (emphasis added); *see also Johnson v. Ford*, 261 F. App'x 752, 755 (5th Cir. 2008)( the Fifth Circuit takes "a strict approach" to the PLRA's exhaustion requirement)(*citing Days v. Johnson*, 322 F.3d 863, 866 (5th Cir. 2003)); *Lane v. Harris Cty. Med. Dep't*, No. 06-20935, 2008 WL 116333, at *1 (5th Cir. Jan.11,

---

[8] As discussed elsewhere in this memorandum opinion, each of these allegations will also be dismissed on the merits.

2008)(under the PLRA, "the prisoner must not only pursue all available avenues of relief; he must also comply with all administrative deadlines and procedural rules"). Indeed, "a prisoner must now exhaust administrative remedies even where the relief sought – monetary damages [for example] – cannot be granted by the administrative process." *Booth v. Churner*, 532 U.S. 731, 739 (2001).

The requirement that claims be exhausted prior to the filing of a lawsuit is mandatory. *Gonzalez v. Seal*, 702 F.3d 785 (5th Cir. 2012). "Whether a prisoner has exhausted administrative remedies is a mixed question of law and fact." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010). As "exhaustion is a threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time, . . . judges may resolve factual disputes concerning exhaustion without the participation of a jury." *Id*. at 272. A prisoner should face a significant consequence for deviating from the prison grievance procedural rules:

> The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievance complies with the system's critical procedural rules. A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction . . . .

*Woodford* at 95.

Mississippi Code Annotated § 47-5-801 grants the Mississippi Department of Corrections the authority to adopt an administrative review procedure at each of its correctional facilities. The Mississippi Department of Corrections has thus set up an Administrative Remedy Program ("ARP") through which an inmate may seek formal review of a complaint or grievance relating to any aspect of his incarceration. This court approved the ARP Program in *Gates v. Collier*, GC 71-6-S-D (N.D. Miss. Feb. 15, 1994). *See also Marshall v. Price*, 239 F.3d 365, 2000 WL 1741549, at *1 (5th Cir. 2000). An inmate must complete two steps to exhaust the ARP process. *See Gates v. Barbour*, No. 4:71CV6-JAD, Doc. 1242 (N.D. Miss. Aug. 19, 2010); *Threadgill v. Moore*, No. 3:10CV378-TSL-

MTP, 2011 WL 4388832, at *3 n.6 (S.D. Miss. July 25, 2011).

The inmate may initiate the two-step ARP grievance process by submitting his allegations in writing to the prison's Legal Claims Adjudicator within thirty days of the incident.[9] *Howard v. Epps*, No. 5:12CV61-KS-MTP, 2013 WL 2367880, at *2 (S.D. Miss. May 29, 2013). The Adjudicator initially screens the complaint and determines whether or not to accept it into the ARP process as a grievance. *Id*. The screening phase thus operates as a filter – applied before the formal grievance process begins – to remove procedurally defective or otherwise invalid grievances.

As set forth above, a prisoner cannot satisfy the exhaustion requirement by filing a procedurally defective grievance or appeal. *Woodford, supra*. Hence, rejection of a grievance during the screening phase terminates the grievance – and does *not* count as exhaustion of the grievance process. *See Seales v. Shaw*, No. 5:15-CV-59-KS-MTP, 2016 WL 616749, at *3 (S.D. Miss. Jan. 26, 2016), *report and recommendation adopted sub nom. Seales v. Wilkinson Cty. Corr. Facility*, No. 5:15-CV59-KS-MTP, 2016 WL 616385 (S.D. Miss. Feb. 16, 2016) (finding rejection during initial MDOC screening process not to constitute exhaustion); *Goldmon v. Epps*, No. 4:14-CV-0112-SA-SAA, 2015 WL 5022087, at *3 (N.D. Miss. Aug. 24, 2015) (same); *see also Robinson v. Wheeler*, 338 Fed. Appx. 437 (5th Cir. 2009) (per curiam) (not reported) (upholding Louisiana initial screening provision of prison grievance process). However, if the defects in the original grievance were minor ("technical" or "matters of form") an inmate may submit a corrected grievance within five days of the rejection:

> If a request is rejected for technical reasons or matters of form, the inmate shall have

---

[9] If an inmate is found guilty of a prison rule violation, he may appeal that finding through the ARP process. Inmate Handbook, Section VIII, Paragraph XI. However, the appeal of a rule violation through the ARP is a one-step process (in contrast to the two-step process for resolving grievances). *Id*.

five days from the date of rejection to file his/her corrected grievance.
*See* https://www.mdoc.ms.gov/Inmate-Info/Documents/CHAPTER_VIII.pdf (last visited April 3, 2019)).

If accepted as a valid grievance, the complaint is forwarded to the appropriate official who then issues a First Step Response to the complaining inmate.[10] *Id*. If the inmate is unsatisfied with the First Step Response, he may continue to the Second Step by completing the appropriate ARP form and sending it to the Legal Claims Adjudicator. *Id*. The Superintendent, Warden, or Community Corrections Director will then issue a final ruling (the Second Step Response) – which completes the ARP process.[11] *Id*. If the inmate is unsatisfied with that response, he may file suit in state or federal court. *Id*.

### Allegations Mentioned in Passing in RVR Appeals: Loss of Property, Harassment, Improper Shakedowns, and Being Strip-Searched

In his appeals of RVRs, the plaintiff mentions in passing several allegations that he now presents in his complaint; however, as discussed below, these passing references do not rise to the level of exhaustion of administrative remedies. The allegations in question are: Loss of Property, Harassment, Improper Shakedowns, and Being Strip-Searched.

---

[10] The submission and screening of the plaintiff's complaints do not constitute the beginning of the ARP process. Instead, the ARP grievance process begins when the inmate's submission is "accepted" as a grievance *after* initial screening. Inmate Handbook, Chapter VIII, Paragraph IV(H).

[11] The grievance process will also be deemed complete if more than 90 days elapses from the beginning of the process (acceptance of the grievance after screening) without issuance of a Second Step Response Form (the normal way to complete the grievance process). Inmate Handbook, Chapter VIII, Paragraph VIII(A). In the absence of a response in a step of the ARP process, the inmate may not simply wait for the 90-day deadline to expire. *Id*. Instead, for each step without a response, he must wait until the deadline for a written response for that step expires, then move to the next step in the process. *Id*. If the inmate has submitted the proper forms for each step, yet 90 days elapses without issuance of a Second Step Response Form, then he has completed the grievance process and may then seek relief in State or Federal court.

In grievance WGCF-24-0261, the plaintiff appealed his guilty finding in RVR 2052142 (possession of CashApp). In his appeal, the plaintiff states that, during the shakedown "nothing was found so I was *harassed* and *threatened* about having a certain amount of property." Doc. 20-3, p. 29 (emphasis added). In addition, the plaintiff mentions "*prior* targeted and *harassment shakedowns*" during his stay at the WGCF (shakedowns he did not challenge during the RVR appeal). *Id.* (emphasis added). He also states in his RVR appeal that *documents* containing "times and dates [and] contact numbers" *were taken*. *Id*. However, none of these allegations formed the basis of his appeal; instead, the plaintiff argued in his appeal that the guilty finding should be overturned due to various administrative errors and insufficient evidence. *Id*. at 29-30. Hence, the ARP did not consider these issues during the RVR appeal, and, as such, the plaintiff has not exhausted his administrative remedies as to these issues.[12]

In grievance WGCF-24-0198, Waldrop appealed the guilty finding on RVR 2089179 (possession of a cell phone). In his appeal, Waldrop states that, during a shakedown of his cell, "[he] was placed back in the cell and directed to strip. [He] stripped and a body search was conducted …." *Id*. at 18. Waldrop merely mentioned the *strip-search* in describing the sequence of events regarding the shakedown; he did not challenge the strip-search in the appeal. The strip-search was not the basis of Waldrop's RVR appeal; instead, he argued that the guilty finding should be overturned due to various administrative errors.[13] *Id*. at 18-19. The appeal was ultimately denied; the Warden found that "policy and procedures were followed in this case[,] … and [I] find no merit to your complaint." *Id.* at

---

[12] In any event, on October 22, 2024, the plaintiff's appeal of the RVR was *granted*, overturning the rule violation; as such, he has no adverse ruling to challenge in this court.

[13] Waldrop has not alleged facts to show that the strip-search violated any right secured under the Constitution; indeed, such searches are commonplace during shakedowns, especially when the inmate is a suspected gang member.

24. The final decision was unrelated to the strip-search.

In sum, the plaintiff's allegations regarding Loss of Property, Harassment, Improper Shakedowns, and Being Strip-Searched will be dismissed without prejudice for failure to exhaust administrative remedies.

## Conclusion

The plaintiff's allegations regarding freedom of association, improper shakedowns, harassment, improper strip-searches, equal protection, and taking of property will be dismissed with prejudice for failure to state a claim under 42 U.S.C. § 1983. In the alternative, the plaintiff's claims regarding improper shakedowns, harassment, improper strip-searches, and the taking of property will be dismissed without prejudice for failure to exhaust administrative remedies.

**SO ORDERED**, this, the 27th day of February, 2026.

/s/   David A. Sanders
UNITED STATES MAGISTRATE JUDGE